|  |  |  |
|---|---|---|
| LACY BAIRD, an individual, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 10-cv-5354 |
| | ) | |
| BLUE CROSS BLUE SHIELD OF TEXAS, | ) | |
| A DIVISION OF HEALTH CARE | ) | |
| SERVICE CORPORATION, A MUTUAL | ) | |
| LEGAL RESERVE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## MOTION BY THE COURT, OPINION, AND ORDER

MARVIN E. ASPEN, District Court Judge:

Plaintiff Lacy Baird has filed a four-count putative class action against Defendant Blue Cross Blue Shield of Texas, a division of Health Care Service Corporation. Because the Northern District of Texas, Dallas Division, is the more appropriate venue for this litigation, this case is transferred there on a motion by the Court.

### I. BACKGROUND

#### A. Allegations in Plaintiff's Amended Complaint

Plaintiff Lacy Baird ("Plaintiff") is a resident of Houston, Texas. (Am. Compl. ¶ 2.) She is suing Defendant Blue Cross Blue Shield of Texas ("BCBSTX"), a division of Health Care Service Corporation, on behalf of herself "and all similarly situated Texas consumers who purchased certain private health insurance policies from [BCBSTX][.]" (*Id.* ¶ 1.)

As the amended complaint sets out in detail, BCBSTX is a doing business designation for Health Care Service Corporation's Texas division.  (*Id.* ¶ 3.)  Health Care Service Corporation is an Illinois company headquartered in Chicago.  (*Id.*)  No separate entity with the name BCBSTX exists in Texas or Illinois.  (*Id.*)  Instead, BCBSTX is merely an internal operating division of Health Care Service Corporation.  (*Id.*)  But because Health Care Service Corporation registers itself to do business in Texas as BCBSTX and because the "events giving rise to this claim concern [BCBSTX]'s activities in the Texas insurance market, Plaintiff has sued the defendant under the name registered with the Texas Department of Insurance."  (*Id.*)

Plaintiff has at times had what is known as a Preferred Provider Organization ("PPO") insurance plan with BCBSTX.  (*Id.* ¶ 6.)  According to Plaintiff, BCBSTX is "by far the largest provider of these types of plans" in Texas.  (*Id.*)  Under a PPO plan, a policyholder's coinsurance rates, deductibles, co-pay amounts, and annual out-of-pocket maximum costs depend on whether the policyholder seeks care from a "preferred provider."  (*Id.* ¶ 7.)  A "preferred provider," also called an "in-network provider," is a health care provider with whom the health insurance company has contracted to set reimbursement rates at discounted levels.  (*Id.* ¶ 8.)  The preferred provider also often agrees not to seek payment from the policyholder for any amount over the agreed-upon reimbursement rate.  (*Id.*)  At the same time, PPO plans include incentives for the policyholder, such as lower coinsurance rates, deductibles, and co-pays, to seek care from preferred providers.  (*Id.*)  Although a PPO policyholder may seek care from a non-preferred provider, also called an "out-of-network provider," the policyholder may be required to pay a higher percentage of that provider's fee.  (*Id.*)  Nevertheless, Plaintiff stresses that, under the

Texas Insurance Code, a PPO policyholder retains "the valuable right to choose 'basic level' care outside of the network[.]" (*Id.* ¶ 14.)

With respect to her PPO plan and others like it, Plaintiff contends that BCBSTX has "render[ed] the consumer's statutory and contractual right to seek care from a doctor or hospital of the insured's choice meaningless and illusory." (*Id.* ¶ 16.) The crux of Plaintiff's concern with her PPO plan is the way BCBSTX determines the benchmark fees for services from out-of-network providers. Plaintiff contends that BCBSTX "unilaterally sets an arbitrary amount that is unreasonably low and well below the usual and customary amount as a reimbursement benchmark for a covered service, and *then* applies the higher coinsurance rates and deductibles [applicable to out-of-network providers] to determine how much [BCBSTX] will pay." (*Id.* (emphasis original).) In other words, Plaintiff accuses BCBSTX of using heavily deflated fees for out-of-network services in calculating its payment obligations under PPO plans like hers. This alleged practice reduces BCBSTX's payments to out-of-network providers, but leaves policyholders on the hook to those providers for the balance of the providers' claimed fees. As Plaintiff summarizes, "by manipulating the rates [BCBSTX] unilaterally assigns out-of-network benefits to far below not only the usual and customary rates, but even below the already discounted rates it pays in-network providers, [BCBSTX] deprives consumers [of] any meaningful option to seek basic level care outside of [BCBSTX's] designated preferred network." (*Id.*)

In her case, Plaintiff alleges that BCBSTX has failed to adequately reimburse her plastic surgeon for several procedures she underwent following a double mastectomy. (*Id.* ¶ 22.) After Plaintiff's in-network surgical oncologist conducted her double mastectomy, the oncologist

referred Plaintiff to a reconstructive plastic surgeon who was not a BCBSTX network provider.

(*Id.*)  As the amended complaint elaborates:

> Ms. Baird followed the advice of her surgeon and agreed to seek reconstructive surgical treatment from the nonpreferred plastic surgeon, for which a higher coinsurance rate and deductible applied.  Ms. Baird was unaware, however, that Blue Cross would not base its portion of the covered procedures on the usual and customary amount billed by the plastic surgeon, which was, from an objective perspective, her reasonable expectation, but instead on Blue Cross's own hidden and insufficient amounts.

(*Id.*)  Thus, Plaintiff underwent multiple surgeries conducted over the course of several months by the out-of-network plastic surgeon.  (*Id.* ¶ 23.)

When it came time to pay, however, Plaintiff charges that "[BCBSTX] severely discounted its reimbursements to her nonpreferred plastic surgeon, resulting in financially crippling 'balance bills,' which Ms. Baird now owes, and which should have been paid by Blue Cross."  (*Id.*)  Specifically, Plaintiff asserts that, of the $73,022.00 billed and submitted by her out-of-network plastic surgeon, BCBSTX has paid $1,177.69.  (*Id.*)

Based on these allegations, the amended complaint enumerates four causes of action, all of which arise under Texas law.  The first cause of action is for breach of Plaintiff's PPO contract with BCBSTX.  Plaintiff cites to specific portions of her PPO contract in which the "Allowable Amount" is set for out-of-network services.  The "Allowable Amount" is generally defined in the contract as the "maximum amount determined by [BCBSTX] to be eligible for consideration of payment for a particular service, supply or procedure."  (*Id.* ¶ 36.)  Specifically with respect to procedures, services, or supplies provided in Texas by out-of-network physicians, Plaintiff's initial contract set the Allowable Amount as follows:

> The Allowable Amount shall be the lesser of the billed charge or the amount [BCBSTX] would have considered for payment for the same covered procedure, service or supply if performed or provided by a Physician . . . with similar experience and/or skill.

(*Id.*)  This provision was in effect until December 2008, when BCBSTX amended Plaintiff's contract.  (*Id.*)  The comparable provision regarding out-of-network hospitals, physicians, and other providers in the amended contract states that:

> The Allowable Amount will be the lesser of the Provider's billed charges or the BCBSTX non-contracting Allowable Amount.  The non-contracting Allowable Amount is developed using BCBSTX Allowable Amount data for similar Network Providers at a service level identified by standard contracting identification methods.

(*Id.*)  The amended contract goes on to provide the following with respect to differences between the Allowable Amount and the out-of-network provider's billed charges:

> The non-contracting [out-of-network] Allowable Amount does not equate to the Provider's billed charges and Participants receiving services from a non-contracting Provider will be responsible for the difference between the non-contracting Allowable Amount and the non-contracting Provider's billed charge, and this difference may be considerable.

(*Id.*)  Based on these and similar contractual provisions, Plaintiff accuses BCBSTX of "routinely reimburs[ing] out-of-network providers who provided care to [Plaintiff and the putative class members] . . . on an unreasonably low, discounted fee basis[.]" (*Id.*)

Plaintiff contends that these contractual provisions "are in direct contravention of Chapter 1301 of the Texas Insurance Code, and are therefore unenforceable under the doctrines of illegality, unconscionability, or both."  (*Id.* ¶ 37.)  According to the amended complaint, Chapter 1301 of the Texas Insurance Code ("Chapter 1301" or "Section 1301") is the primary provision of Texas statutory law regulating PPO health insurance plans.  (*Id.* ¶ 9.)  Of particular relevance, Chapter 1301 provides that "[a]n insurer or third-party administrator *may not* reimburse a [provider] *on a discounted fee basis* for covered services that are provided to an insured *unless* . . . the insurer . . .  has contracted with either . . . [the provider] or . . . a preferred provider organization that has a network of preferred providers and that has contracted with [the

provider].”  (*Id.* ¶ 13 (quoting Tex. Ins. Code § 1301.056(a)) (emphasis added by Plaintiff).)

Additionally, Chapter 1301 also states that a PPO policyholder's coinsurance obligations for out-of-network care cannot “exceed 50 percent of the total covered amount applicable to the medical or health care services.”  (*Id.* ¶ 11 (quoting Tex. Ins. Code § 1301.046).)  Plaintiff alleges that BCBSTX's method of reimbursing out-of-network providers is in direct contravention of these statutory provisions and is thus illegal and unconscionable.  (*Id.* ¶ 37.)

Plaintiff also offers two additional breach of contract theories based on the aforementioned provisions.  First, Plaintiff alleges that these provisions are “unconscionable because their net effect is to provide an unjust windfall to [BCBSTX] . . . whenever a policyholder exercises her statutory and contractual right to seek care from an out-of-network provider.”  (*Id.* ¶ 38.)  As Plaintiff explains: “[BCBSTX] not only applies the higher coinsurance rate when a policyholder seeks out-of-network care . . . but [BCBSTX] then arbitrarily and unilaterally sets a hidden reimbursement rate . . . so that [BCBSTX] pays a much lower percentage of the provider's fee and the insured become[s] liable for a much higher percentage.” (*Id.*)  Second, Plaintiff also contends that the terms of her initial contract were “ambiguous as a matter of law.”  (*Id.* ¶ 39.)  Specifically, Plaintiff contends that “defining the Allowable Amount as some unstated amount that Blue Cross might subjectively ‘have considered for payment,’ could mean practically anything, and must therefore be construed against [BCBSTX][.]”  (*Id.*) As such, Plaintiff alleges that BCBSTX “breached its contracts of insurance with [Plaintiff and the putative class members] by improperly reimbursing out-of-network providers on a discounted fee basis[.]”  (*Id.*)

In addition to the breach of contract claim, the amended complaint sets out three additional causes of action. Count Two alleges violation of another provision of the Texas Insurance Code. In particular, Plaintiff outlines seven ways in which BCBSTX has allegedly "violated Chapter 541, Subchapter B, of the Texas [I]nsurance [C]ode by engaging in unfair and deceptive acts or practices in the business of insurance[.]" (*Id.* ¶ 42a–g.) Count Three identifies five provisions of the Texas Deceptive Trade Practices Act that Plaintiff contends BCBSTX has violated through its PPO plans. (*Id.* ¶ 45a–e.) Lastly, Count Four seeks injunctive relief based on the first three counts. (*Id.* ¶ 48.)

### B. Procedural History

Plaintiff filed her initial complaint on August 24, 2010. (Dkt. No. 1.) In lieu of answering, BCBSTX filed a motion to dismiss pursuant to Rule 12(b)(6) for failure to state a claim. (Dkt. No. 14.) Instead of responding to the motion, Plaintiff filed an amended complaint within the time allotted for doing so as of right under Rule 15(a). (Am. Compl.) As before, BCBSTX moved to dismiss the amended complaint for failure to state a claim. (Dkt. No. 28.)

In its motion to dismiss the amended complaint and supporting memorandum, BCBSTX challenged Plaintiff's standing and the reading of the Texas Insurance Code upon which her claims are based. Regarding Plaintiff's standing, BCBSTX characterized the allegations in the amended complaint as "thinly-veiled attempts to assert direct claims under sections of the Texas Insurance Code that do not authorize a private cause of action." (Dkt. No. 29 at 5.) BCBSTX further argued that "[o]nly the Texas Department of Insurance . . . can enforce alleged violations of sections 1301.056 and 1301.0046 [of the Texas Insurance Code]." (*Id.*) Regarding the substance of Plaintiff's allegations based on the Texas Insurance Code, BCBSTX argued that

Plaintiff "reads [section 1301.056] subsection (a) in isolation from the remainder of 1301.056 and takes it completely out of context from chapter 1301, which applies to *contracted* preferred provider arrangements." (*Id.* at 3 (emphasis original).) BCBSTX further contended that "[Plaintiff's] application of section 1301.056(a) further ignores entire sections and one whole chapter of the Texas Insurance Code[.]" In BCBSTX's view, "[t]he legislative history demonstrates that section 1301.056 was intended to address 'silent PPO' arrangements, or situations where an insurer takes advantage of another health network's *contracted* discount rate." (*Id.* (emphasis original).) BCBSTX also suggested that Plaintiff had employed a similar misreading of Section 1301.0046 in crafting her claims. (*Id.* at 4, 9–11.) Due to this misreading of Chapter 1301, BCBSTX urged dismissal of all Plaintiff's claims. (*Id.* at 11–15.)

Plaintiff responded to the motion to dismiss by arguing that the interpretations of Chapter 1301 upon which her claims are based accord with the principles of statutory interpretation applicable under Texas law. (Dkt. No. 39 at 16–18.) Specifically, Plaintiff argued that her interpretation "reflects the plain meaning of [section 1301.056(a)]" and that she was not reading the provision out of context. (*Id.* at 18, 20.) Regarding section 1301.0046, Plaintiff asserted that her reading of the provision accorded with the Texas legislature's intent, while BCBSTX's interpretation "would render the protections of 1301.0046 virtually meaningless." (*Id.* at 26–28.) Plaintiff then concluded by extensively discussing how "the legislative history and view of the Texas Department of Insurance supports [sic] [Plaintiff's] interpretation of Chapter 1301[.]" (*Id.* at 28–33.)

In reply, BCBSTX argued that "[Plaintiff's] 'plain language' interpretation of Section 1301 leads to absurd results." (Dkt. No. 43 at 1.) Without the benefit of this erroneous reading

of the statute, BCBSTX reiterated that the amended complaint stated no plausible claims for relief. (*Id.* at 9–15.)

After receiving and reviewing the parties' briefs on the motion to dismiss the amended complaint, we asked the parties to address "whether 'for the convenience of the parties and witnesses [and] in the interest of justice' transfer of this case to the Southern District of Texas, Houston Division is warranted." (Dkt. No. 48 at 2 (quoting 28 U.S.C. § 1404(a)).) In particular, we asked whether the prevalence of Texas statutory law undergirding Plaintiff's claims made adjudication of this case by a federal district court sitting in Texas more appropriate. (*Id.* at 2.)

The parties have since weighed in on the transfer issue. BCBSTX does not object to the transfer of the case to a federal district court in Texas, although it prefers the Northern District over the Southern District due to its greater presence in the former. (Dkt. Nos. 50 & 54.) Plaintiff opposes transfer away from this forum but, in the event of such a transfer, she prefers her home forum, the Southern District of Texas. (Dkt. Nos. 49, 51 & 53.)

## II. ANALYSIS

This case is now before us on our own motion to transfer venue. The transfer statute, 28 U.S.C. § 1404(a), provides that: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." As Wright & Miller summarize: "The language of the statute [28 U.S.C. § 1404(a)] is broad enough that a district judge can order transfer on his or her own initiative, as has been recognized in many cases." *Charles A. Wright & Arthur Miller*, 15 *Federal Practice & Procedure* § 3844 (3d ed. 2007) (collecting cases). The Seventh Circuit, albeit in an unpublished order, has recently recognized the propriety of a district court

transferring a case *sua sponte*, as have several other circuit courts. *Germaine v. St. Germain*, No. 10-3796, 2011 WL 1897399, at *1 (7th Cir. May 19, 2011) (citing *Carver v. Knox County*, 887 F.2d 1287, 1291 (6th Cir. 1989) ("In fact, 28 U.S.C. § 1404(a) does not require a motion; a district court may transfer a case *sua sponte*."); *Mills v. Beech Aircraft Corp., Inc.*, 886 F.2d 758, 761 (5th Cir. 1989) ("Such transfers may be *sua sponte*."); *Muldoon v. Tropitone Furniture Co.*, 1 F.3d 964, 965 (9th Cir. 1993) (accepting that district court in Northern District of Illinois properly transferred case "on its own motion" to the Southern District of California)). Indeed, the practice is well-established here in the Northern District of Illinois. *See, e.g., Marquette Transp. Co. v. Trinity Marine Products, Inc.*, No. 06-C-4506, 2006 WL 3783412, at *1 (N.D. Ill. Dec. 19, 2006); *SB Designs v. Reebok Intern., Ltd.*, 305 F. Supp. 2d 888, 889 (N.D. Ill. 2004); *Chukwu v. Air France*, 218 F. Supp. 2d 979, 990 (N.D. Ill. 2002). Thus, it is within our authority to raise the transfer issue without a motion by either party.

There are several factors courts consider in deciding whether to transfer a case to another federal district court pursuant to 28 U.S.C. § 1404(a). As a threshold matter, the court considering transfer—the transferor court—must determine whether venue is proper in the district where the action was originally filed and whether venue would be proper in the transferee court. *Morton Grove Pharms., Inc. v. Nat'l Pediculosis Ass'n*, 525 F. Supp. 2d 1039, 1044 (N.D. Ill. 2007) (citing *Vandeveld v. Christoph*, 877 F. Supp. 1160, 1167 (N.D. Ill. 1995)). The federal venue statute establishes that, where jurisdiction in a civil action "is founded only on diversity of citizenship," venue is proper in:

> (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant is subject to personal

jurisdiction at the time the action is commenced, if there is no district in which the action
may otherwise be brought.

28 U.S.C. § 1391(a). In determining where a defendant resides for venue purposes, the statute

further provides that "a defendant that is a corporation shall be deemed to reside in any judicial

district in which it is subject to personal jurisdiction at the time the action is commenced." *Id.*

§ ©.

In this case, venue is proper here in the Northern District of Illinois and in both of the

proposed transferee courts, the Northern and Southern Districts of Texas. The sole defendant is

a corporation that was subject to personal jurisdiction in all of these districts at the time this case

was brought. Neither  party disputes this point. The defendant, although headquartered in the

Northern District of Illinois, also has a Texas division with an extensive presence throughout that

state. Thus, this case could have been brought in any of the venues under consideration.

The main concern here, then, is whether "the convenience of parties and witnesses" and

"the interest of justice" warrant transfer of this case to a federal district court in Texas, and, if so,

which one. 28 U.S.C. § 1404(a). As the Seventh Circuit has recognized, deciding whether to

transfer a case to another federal district court requires "flexible and individualized analysis"

based on the circumstances of a particular case. *Research Automation, Inc. v. Schrader-*

*Bridgeport Intern., Inc.*, 626 F.3d 973, 978 (7th Cir. 2010) (internal citations omitted); *see also*

*Coffey v. Van Dorn Iron Works*, 796 F.2d 217, 219 (7th Cir. 1986). Given the case-specific

nature of this inquiry, district courts are afforded wide discretion in deciding whether transfer is

appropriate. *Tice v. American Airlines, Inc.*, 162 F.3d 966, 974 (7th Cir. 1988).

In deciding whether transfer would promote convenience, courts consider such factors as

"the availability of and access to witnesses . . . each party's access to and distance from

resources in each forum . . . the location of material events and the relative ease of access to sources of proof." *Research Automation*, 626 F.3d at 978 (internal citations omitted). Evaluating the "interest of justice" under the transfer statute involves a comparison of: "docket congestion and likely speed to trial in the transferor and potential transferee forums . . . each court's relative familiarity with the relevant law . . . the respective desirability of resolving controversies in each locale . . . and the relationship of each community to the controversy[.]" *Id.* The Seventh Circuit has also repeatedly held that "the interest of justice may be determinative, warranting transfer or its denial even when the convenience of the parties and witnesses points toward the opposite result." *Id.* (citing *Coffey*, 796 F.2d at 220–21). Furthermore, in a diversity action such as this one, "it is also considered advantageous to have federal judges try a case who are familiar with the applicable state law." *Coffey*, 796 F.2d at 221 (citing *Van Dusen*, 376 U.S. at 645, 84 S.Ct. at 824).

In this case, because the "interest of justice" factors predominate and by themselves support transfer to a federal district court in Texas, we discuss them first.[1]  Then, we explain why Plaintiff's choice of forum deserves little weight given that she represents a putative class and has opted to litigate outside of her home forum in the first place.  Lastly, we conclude that convenience warrants transfer of this case to the Northern District of Texas, Dallas Division, rather than the Southern District of Texas, Houston Division.

---

[1]  Because our primary reason for transfer is the novel application and interpretation of Texas law required by Plaintiff's claims, we first compare Texas and Illinois generally as possible venues.  We then examine which federal district court within the state of Texas is the most appropriate venue.

## A. Interest of Justice

After reviewing the amended complaint and the parties briefs on the pending motion to dismiss, we asked the parties to offer their views on how the last three interest of justice factors—familiarity with the governing law, the respective desirability of resolving controversies in each locale, and the relationship of each community to the controversy—should be weighed.[2] We now hold that all three weigh heavily in favor of transferring this case to a federal district court sitting in Texas.

The relative familiarity with the governing law strongly favors transferring this case to a federal district court in Texas. As indicated above, all four of Plaintiff's claims arise under Texas law. It is true, as Plaintiff argues, that federal courts routinely apply the laws of various states, particularly in diversity jurisdiction cases such as this one. (Dkt. No. 49 at 2.) But several considerations make a federal court sitting in Texas, rather than one in Illinois, the preferred arbiter of the law applicable to this case. Plaintiff points out that "a Westlaw search reveals that no Texas Federal Court has ever cited, much less analyzed, the key provisions of Chapter 1301 of the Texas Insurance Code at issue in this case." (*Id.*) Plaintiff uses this fact to argue that "there is no reason to assume that a Federal Court in Texas has dealt with the relatively new and obscure Texas insurance statute at issue here." (*Id.*) But in our view, the

---

[2] We did not seek briefing on the first interest of justice factor, docket congestion, because it is not particularly impactful in light of the comparable docket congestion in the forums under consideration. If anything, this factor supports transfer to the Northern District of Texas. The median times from filing to completion of trial in the courts under consideration are as follows: 25.4 months for the Northern District of Illinois; 19.5 months for the Northern District of Texas; and 22.4 months for the Southern District of Texas. *James C. Duff, Admin. Office of the United States Courts, Judicial Business of the United States Courts: Annual Report of the Director* 175 (2010), *available at* http://www.uscourts.gov/uscourts/Statistics/ JudicialBusiness/2010/appendices/C05Sep10.pdf (last visited Sept. 7, 2011).

novelty and obscurity of Chapter 1301 of the Texas Insurance Code provide all the more justification for why this statute should be interpreted for the first time by a federal court in Texas. Even if the federal court in Texas may not be familiar with this particular provision, it is far more likely to have previously encountered the Texas Insurance Code generally. And as BCBSTX's arguments in support of its motion to dismiss reveal, the relationship of Chapter 1301 to the rest of the Texas Insurance Code is likely to play a major role in deciding that motion. Indeed, BCBSTX's primary point in its motion is that the amended complaint presents Chapter 1301 entirely out of context. It is rather obvious, then, that a court at least somewhat familiar with that context would be better suited to evaluate such an argument. Similarly, both parties' briefs on the motion to dismiss rely heavily on Texas canons of statutory interpretation and the legislative history of the Texas legislature. The federal court in Texas is likely to be much more knowledgeable of this terrain.

The relationship of the respective communities in Texas and Illinois to this case and the desirability of resolving it in each locale also strongly support transfer. As the allegations in the amended complaint indicate, if Plaintiff's claims stand, this case will have significant impact on the health insurance industry throughout the state of Texas. Plaintiff purports to bring her claims on behalf of herself and "all similarly situated Texas consumers who purchased certain private health insurance policies from [BCBSTX]." (Am. Compl. ¶ 1.) BCBSTX is "by far the largest provider of [the] types of plans" at issue in the state of Texas. (*Id.* ¶ 6.) Indeed, Plaintiff alleges that, as of 2008, BCBSTX controlled more than one quarter of the Texas private health insurance market and collected over $5 billion in annual premiums from Texas residents. (*Id.*) And although Plaintiff rightly points out that Illinois has some interest in this case, given that

BCBSTX is a division of Health Service Corporation, an Illinois company, that interest is small

by comparison.  If we were to enjoin BCBSTX from reimbursing out-of-network providers in the

manner it does, as Plaintiff has requested in Count IV of the amended complaint, the effects

would be felt by policyholders, insurance companies, and health care providers throughout the

state of Texas.  In Illinois, the effect of an injunction would of course be felt at the corporate

headquarters of Health Service Corporation here in Chicago but hardly anywhere beyond.

Regardless of who wins this case or the nature of the relief obtained, the size of the putative class

and the theory behind the claims at issue mean that the impact of this case is likely to be much

greater in Texas than in Illinois.  Thus, Texas has a greater interest in this litigation, and the

better course is to resolve it there.[3]

### B.  Plaintiff's Choice of Forum

Despite these considerations, Plaintiff maintains that we ought not transfer this case

because her choice of forum is entitled to "some weight."  (Dkt. No. 49 at 3 (quoting *Fed. Dep.*

---

[3]  Plaintiff argues that the delay occasioned by transferring the case would "not serve the interests of justice."  (Dkt. No. 49 at 3.)  While it is true that this case has been pending in the Northern District of Illinois for over a year and there is a fully briefed motion to dismiss the amended complaint pending, Plaintiff's argument is not persuasive.  Plaintiff is at least partially responsible for any delay experienced in adjudicating this case in the Northern District of Illinois.  After BCBSTX moved to dismiss the initial complaint, Plaintiff sought more time to respond to that motion.  (Dkt. No. 19.)  Instead of responding, however, Plaintiff filed an amended complaint.  (Dkt. No. 24.)  While Plaintiff had the right to do so, the filing of the amended complaint necessarily slowed the adjudicative process down.  Furthermore, when BCBSTX moved to dismiss the amended complaint, Plaintiff joined with BCBSTX in requesting a longer briefing schedule than we had initially allowed because of "the complex nature of the issues in this case."  (Dkt. No. 32 at 2.)  Thus, responsibility for the delay rests in part on Plaintiff's shoulders.  Regardless, we struggle to see how transfer of this case is likely to unduly prolong this litigation.  Once transfer of this case occurs, BCBSTX can renew its motion to dismiss in the new forum.  The briefs submitted here on that motion can be resubmitted there in almost identical form.  The delay caused by transfer will be minimal.

*Ins. Corp. v. Citizens Bank & Trust Co. of Park Ridge, Ill.*, 592 F.2d 364, 368 (7th Cir. 1979).)
Plaintiff is correct that her choice of forum is entitled to some weight, but several aspects of this
case make this weight less than it might otherwise be.

First, courts in this district have frequently held that a plaintiff's choice of forum
deserves less weight when the plaintiff's chosen forum is not the plaintiff's home forum. *Plotkin
v. IP Axess, Inc.*, 168 F. Supp. 2d 899, 902 (N.D. Ill. 2001); *Bryant v. ITT Corp.*, 48 F. Supp. 2d
829, 831 (N.D. Ill. 1999); *Nero v. American Family Mut. Ins. Co.*, No. 11-C-1072, 2011 WL
2938138, at *2 (N.D. Ill. July 19, 2011). Here, Plaintiff's home forum is the Southern District of
Texas, yet she has chosen to bring this case in the Northern District of Illinois. (Am. Compl. ¶
2.) Aside from the possibility of forum shopping, we struggle to see why Plaintiff chose to bring
this suit so far away from home. Accordingly, Plaintiff's choice of forum deserves less weight,
because she has chosen to litigate outside of her home forum.

Second, courts in this district have repeatedly discounted the weight afforded a plaintiff's
choice of forum when the plaintiff purports to represent a class. *Nero*, 2011 WL 2938138 at *2;
*Klutho v. 21st Century Ins. Co.*, No. 07-C-4111, 2007 WL 4224296, at *2 (N.D. Ill. Nov. 26,
2007); *Finley v. Dun & Bradstreet Corp.*, No. 05-C-5134, 2006 WL 861920, at *2 (N.D. Ill.
Mar. 30, 2006); *Countryman v. Stein Roe & Farnham*, 681 F. Supp. 479, 482–83 (N.D. Ill.
1987). For instance, in a recent case in this district, Judge Feinerman viewed the plaintiff's
choice of forum as bearing almost no weight where the plaintiff purported to represent "a class
whose members largely hail from Colorado" in claims arising under Colorado law against a car
insurance provider. *Id.* Substituting Texas for Colorado and health insurance for car insurance,
Plaintiff is attempting to do essentially the same thing here. Indeed, Plaintiff purports to

represent a class including herself "and all similarly situated Texas consumers who purchased certain private health insurance policies from [BCBSTX]." (Am. Compl. ¶ 1.) No doubt some of these purported class members would (if asked) prefer to litigate this case in Texas. Plaintiff's decision to bring this case in Illinois would likely be as inexplicable to them as it is to us. Thus, given that she purports to represent a class made up almost entirely of Texas consumers, Plaintiff's decision to litigate this case in Illinois deserves little weight.

Third, courts in this district have also given the plaintiff's choice of forum far less weight when "the chosen forum has relatively weak connections with the operative facts giving rise to the claim." *Colida v. Kyocera Wireless Corp.*, No. 02-C-7348, 2003 WL 1741396, at *2 (N.D. Ill. Apr. 1, 2003) (quoting *Van Holdt v. Husky Injection Molding Systems, Ltd.*, 887 F. Supp. 185, 188 (N.D. Ill. 1995)). Although Plaintiff has attempted to tie this case to the Northern District of Illinois in her briefs on the transfer issue, her own allegations and BCBSTX's submissions tether the facts of this case almost exclusively to Texas. In fact, Plaintiff rather forthrightly states in the amended complaint that "the events giving rise to this claim concern [BCBSTX's] activities in the Texas insurance market[.]" (Am. Compl. ¶ 3.) Plaintiff, a resident of Houston, has further affirmed that she received the medical treatments for which BCBSTX allegedly underpaid her provider in Texas. (Am. Compl. ¶ 2; Dkt. No. 53 at 3.) BCBSTX has also stated that its "employees responsible for making decisions about the out-of-network reimbursement policies and practices at issue in the case work in Richardson, Texas," a suburb of Dallas. (Dkt. No. 54 at 1.) Indeed, BCBSTX "does not currently anticipate calling as its witnesses executives in [Health Service Corporation's] Chicago headquarters, because the decisions and activities at issue took place in Texas[.]" (*Id.* at 4.) It is clear then that Plaintiff's

chosen forum, the Northern District of Illinois, "has relatively weak connections" with the operative facts in this case. *Colida*, 2003 WL 1741396 at *2. We therefore discount Plaintiff's choice of forum even further to what is, at this point, a vanishing level of significance.

For these reasons, Plaintiff's decision to bring this case in the Northern District of Illinois is of minimal significance. It does little to dissuade us from the conclusion that the "interest of justice" warrants adjudication of this case by a federal district in Texas.

### C. Convenience

As indicated, we find that the "interest of justice" standing alone warrants transfer of this case, and so we need not dwell on whether convenience dictates the same result. *Research Automation*, 626 F.3d at 978. For the sake of completeness, however, we conclude that it does. Most, if not all, of the likely witnesses reside in Texas. (Am. Compl. ¶ 2; Dkt. No. 54 at 1–3.) Transfer to Texas would improve Plaintiff's access to and distance from resources, while BCBSTX position in this respect would remain largely unchanged in light of its extensive operations throughout the state and in the Dallas area in particular. Lastly, many of the material events in this case occurred in Texas, including Plaintiff's medical treatment and BCBSTX's decisions regarding out-of-network reimbursement methodology in the Texas insurance market. All of these factors affirm that the convenience of both parties and witnesses would benefit from transfer of this case to Texas. 28 U.S.C. § 1404(a).

We must also decide, however, where in Texas to transfer this case. When we initially raised the transfer issue with the parties, BCBSTX voiced no objection to transfer of this case to Texas but stated that it would prefer the Northern District of Texas because it has corporate offices in the Dallas area where many of the decisions pertinent to Plaintiff's claims were made.

(Dkt. No. 50.)  Given that our request for briefing focused on the possibility of transfer to the Southern District of Texas, Plaintiff retorted that the defendant was making an improper motion for transfer to the Northern District of Texas.  (Dkt. No. 51.)  We allowed Plaintiff an opportunity to state her preference, and she prefers the Southern District over the Northern District of Texas.  (Dkt. Nos. 52 & 53.)  Nevertheless, we now hold that the Northern District of Texas is a more convenient forum than the Southern District of Texas.

As an initial matter, we again observe that Plaintiff's preference of Texas forums is of virtually no moment in this case.  While Plaintiff complains that "Plaintiff has never taken any action that could lead her to see that she could be haled into a court in Dallas and forced to prosecute her own case, against her will, in a district to which she has no meaningful connection," this argument has little resonance in light of Plaintiff's initial decision to bring this law suit in Chicago.  (Dkt. No. 53 at 3.)  Furthermore, even though the facts pertinent to Plaintiff's treatment and accrual of medical bills arose in the Houston area, where Plaintiff resides, Plaintiff is bringing this case on behalf of a purported class with members throughout the state of Texas.  As a result, any convenience that accrues to her from litigating in her home forum is likely to come at the expense of her fellow class members residing in other districts in the state.  For these reasons, Plaintiff's preference for the Southern District of Texas does not significantly favor that forum.

Rather, there are several reasons why the Northern District of Texas would be a more convenient forum.  As BCBSTX set out in detail in an affidavit attached to its brief on the issue, most if not all of its witnesses in this case live and work in the Dallas area.  (Dkt. No. 54, Ex. 1.)  And although the trip from Plaintiff's home in Houston to Dallas will impose some

inconvenience on her, this inconvenience is less than it would be if this case were tried here in Chicago, where Plaintiff initially brought her case. The same is true with respect to Plaintiff's treating physician, who would have faced an even more substantial inconvenience if Plaintiff had continued to litigate this case in the forum she initially chose. Furthermore, Plaintiff's "access to and distance from resources" will be no worse in Dallas than it would have been here in Chicago. *Research Automation*, 626 F.3d at 978. Given that Plaintiff apparently viewed this consideration to be inconsequential in her forum selection process, we view it in the same light in considering the federal court in Dallas versus the one in Houston. On the other hand, BCBSTX's access to resources will apparently be greater in Dallas than in Houston. (Dkt. No. 54 at 4.)

Finally, the location of material events also favors Dallas over Houston. While it is true that Plaintiff received the treatment underlying her claims in the Houston area, BCBSTX's decisions about out-of-network reimbursement policies and practices occurred in the Dallas area. (*Id.* at 1–2.) Once again, in light of the fact that Plaintiff purports to represent a class of consumers spread across the state of Texas, the facts pertinent to Plaintiff herself are of less significance than those pertaining to BCBSTX's broader decisionmaking process regarding out-of-network reimbursement generally. This process, as BCBSTX has attested, occurred mostly in the Dallas area. (*Id.*) For these reasons, adjudication of this matter would be more convenient in the Northern District of Texas, Dallas Division, than in the Southern District of Texas, Houston Division.

## III. CONCLUSION

On a motion by the Court, this case is transferred to the Northern District of Texas, Dallas Division.  All motions pending here in the Northern District of Illinois are terminated as moot and without prejudice as to refiling following transfer.  It is so ordered.


_____
Honorable Marvin E. Aspen
U.S. District Court Judge

Date: September 14, 2011